Chief Judge DiFIORE.
*801 **462 The issue presented is whether an agency may decline to acknowledge that requested records exist in response to a Freedom of Information Law request ( Public Officers Law § 84 et seq. [FOIL] ) when necessary to safeguard statutorily exempted information. Under these circumstances, we hold that it may and therefore affirm the Appellate Division order, which reached the same conclusion.
The federal courts have long permitted federal agencies responding to Freedom of Information Act ( 5 USC § 552 [FOIA] ) requests to neither confirm nor deny the existence of responsive documents-a so-called Glomar response-when the agency's acknowledgement that it possesses responsive documents would itself reveal information protected from disclosure under a FOIA exemption. In the context presented here, where a law enforcement agency was asked to disclose records relating to a police investigation and surveillance activities involving two specific individuals and associated organizations-information protected under the law enforcement and public safety exemptions of Public Officers Law § 87 -such a response is compatible with the FOIL statute and our precedent interpreting it.
***223 In October 2012, petitioners Talib Abdur-Rashid and Samir Hashmi separately submitted targeted FOIL requests seeking any records possessed by the New York City Police Department (N.Y.PD) related to any "surveillance" and "investigation" of them as individuals and of certain specified entities with which they were associated (including a mosque and a university student association, respectively) for the six-year period immediately preceding the request. The agency denied the requests, stating in each case that the information, "if possessed by the NYPD," would be protected from disclosure under various statutory exemptions, including the law enforcement, public safety and personal privacy provisions. After the NYPD adhered to those decisions on administrative appeal, petitioners commenced separate CPLR article 78 proceedings challenging the determinations. Petitioners asserted that the NYPD was engaged in an ongoing domestic surveillance program in which, as alleged in press articles, it had targeted Muslim individuals, places of worship, businesses, schools, student groups and the like. It was in this context that petitioners attempted to ascertain whether they were subjects of surveillance or investigation, noting that they had supplied certifications of identity waiving their personal privacy interests and authorizing the *802 **463 NYPD to release responsive records to their attorneys.[1]
The NYPD's response, although styled as a motion to dismiss the petition in each case, did not assert a procedural objection but defended the FOIL responses on the merits. The agency explained the basis for its denial of the FOIL requests and its refusal to disclose whether it possessed responsive documents in a 22-page affidavit of its Chief of Intelligence, Thomas Galati. Without offering any specific information relating to petitioners, Chief Galati described the NYPD's ongoing and wide-ranging counterterrorism efforts, acknowledging that the agency was actively engaged in covert surveillance and other intelligence gathering in its effort to preempt acts of terrorism in New York City, which remains a prime target in the wake of the World Trade Center attacks. The Galati affidavit averred that disclosure of whether the NYPD possesses records responsive to the FOIL requests would necessarily reveal whether petitioners had been the subjects of its investigation, ***224 information which-particularly if aggregated-would provide unprecedented and invaluable information concerning NYPD counterterrorism strategies, operations, tactics and techniques to those planning future terrorist attacks. The Galati affidavit also averred that the NYPD intelligence strategies are monitored by individuals and organizations with the goal of developing counterintelligence measures, and the greatest vulnerability to the NYPD Intelligence Bureau is the release of even "seemingly innocuous information" which would inexorably reveal sources from which information is gathered by the NYPD.
The proceedings were assigned to different justices for resolution. In Abdur-Rashid, Supreme Court granted the NYPD's motion to dismiss and denied the petition, reasoning that the NYPD demonstrated that its response-including its refusal to acknowledge whether responsive records existed-was not prohibited by FOIL as the records sought were exempt from disclosure under the statute and the cases interpreting it ( 45 Misc.3d 888, 992 N.Y.S.2d 870 [Sup. Ct., NY County 2014] ). In Hashmi, although not disputing that the content of responsive records may be exempt, Supreme Court, among other things, denied the motion to dismiss on the rationale that the NYPD's failure to acknowledge whether or not responsive records existed was impermissible under FOIL ( 46 Misc.3d 712, N.Y.S.2d 596 [Sup. Ct., NY County 2014] ). Hearing the cases together, the Appellate Division affirmed in Abdur-Rashid and, among other things, reversed the order denying the motion to dismiss in Hashmi, granting the motion and dismissing the petition ( 140 A.D.3d 419, 37 N.Y.S.3d 64 [1st Dept. 2016] ). The Appellate Division reasoned that, through the affidavits of Chief Galati, the NYPD had "establish[ed] that confirming or denying the existence of the records would reveal whether petitioners or certain locations or organizations were the targets of surveillance, and would jeopardize NYPD investigations and counterterrorism efforts" in contravention of the law enforcement and public safety exemptions (see id. at 421, 37 N.Y.S.3d 64 ). Thus, the Court held that NYPD's refusal to confirm or deny the existence of responsive records was consistent with FOIL and the cases construing it. We granted petitioners leave to appeal ( 28 N.Y.3d 908, 47 N.Y.S.3d 223, 69 N.E.3d 1019 [2016] ).
*803 **464 To promote open government and public accountability, FOIL imposes a broad duty on government agencies to make their records available to the public (see Public Officers Law § 84 ). The statute is based on the policy that "the public is vested ***225 with an inherent right to know and that official secrecy is anathematic to our form of government" ( Matter of Fink v. Lefkowitz, 47 N.Y.2d 567, 571, 419 N.Y.S.2d 467, 393 N.E.2d 463 [1979] ). Consistent with the legislative declaration in Public Officers Law § 84, FOIL is liberally construed and its statutory exemptions narrowly interpreted (see Matter of Data Tree, LLC v. Romaine, 9 N.Y.3d 454, 462, 849 N.Y.S.2d 489, 880 N.E.2d 10 [2007] ). All records are presumptively available for public inspection and copying, unless the agency satisfies its burden of demonstrating that "the material requested falls squarely within the ambit of one of [the] statutory exemptions" ( Fink, 47 N.Y.2d at 571, 419 N.Y.S.2d 467, 393 N.E.2d 463 ). "While FOIL exemptions are to be narrowly read, they must of course be given their natural and obvious meaning where such interpretation is consistent with the legislative intent and with the general purpose and manifest policy underlying FOIL" ( Matter of Hanig v. State of N.Y. Dept. of Motor Vehs., 79 N.Y.2d 106, 110, 580 N.Y.S.2d 715, 588 N.E.2d 750 [1992] [internal quotation marks and citation omitted] ). Nor may the courts order disclosure of records deemed confidential by the Legislature: "[o]nce it is determined that the requested material falls within a FOIL exemption, no further [balancing of interests] or policy analysis is required" ( id. at 112, 580 N.Y.S.2d 715, 588 N.E.2d 750 ).[2]
From the outset of FOIL, the legislature expressly exempted certain agency records from public access, recognizing that there is sometimes "a legitimate need on the part of government to keep some matters confidential" ( Fink, 47 N.Y.2d at 571, 419 N.Y.S.2d 467, 393 N.E.2d 463 ). For example, the law enforcement exemption and the public safety exemption, which the NYPD relied on here, protect records that, if disclosed, would interfere with law enforcement investigations or judicial proceedings, reveal nonroutine criminal investigative techniques or endanger the ***226 life or safety of any person ( Public Officers Law § 87[2][e][i], [iv], [f] ). When interpreting these provisions, we have emphasized that "the purpose of [FOIL] is not to enable persons to use agency records to frustrate pending or threatened investigations nor to use that information to construct a defense to impede a prosecution" ( Matter of Madeiros v. New York State Educ. Dept., 30 N.Y.3d 67, 77, 64 N.Y.S.3d 635, 86 N.E.3d 527 [2017] [internal quotation marks and citation omitted] ). FOIL was not designed to assist *804 **465 wrongdoers in evading detection or, put another way, "to furnish the safecracker with the combination to the safe" ( Fink, 47 N.Y.2d at 573, 419 N.Y.S.2d 467, 393 N.E.2d 463 ). As this Court has acknowledged, the disclosure of information acquired by the police during a criminal investigation "could potentially endanger the safety of witnesses, invade personal rights, and expose confidential information of nonroutine police procedures" ( Matter of Gould v. New York City Police Dept., 89 N.Y.2d 267, 278, 653 N.Y.S.2d 54, 675 N.E.2d 808 [1996] ).
In Matter of Lesher v. Hynes, 19 NY3d 57, 60-61, 945 N.Y.S.2d 214, 968 N.E.2d 451 (2012), an author sought "any and all" records from a District Attorney's office concerning its pending prosecution of a defendant charged with sexual abuse who fled the country "one step ahead of an arrest warrant." The District Attorney declined to turn over any records, broadly asserting that any records relevant to the pending prosecution-including correspondence with federal officials relating to extradition efforts-were protected from disclosure under the law enforcement exemption. Petitioner argued, among other things, that the District Attorney had not adequately explained how the release of records relating to a publicly acknowledged prosecution would interfere with law enforcement investigations or judicial proceedings. In rejecting that argument, we adopted the analysis in NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) in which the United States Supreme Court held-interpreting its own analogous law enforcement exemption ( 5 USC § 552 [b][7][A] )-that courts may determine that "with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally 'interfere with enforcement proceedings' " ( Robbins, 437 U.S. at 236, 98 S.Ct. 2311, quoting 5 USC § 552 [b][7][A] ). Thus, in the case of a pending criminal investigation or prosecution, a law enforcement agency is not required to make a specific evidentiary showing relating to the likelihood that disclosure of records would pose any unique or unusual danger of interference in the individual case that is the subject of the request ( ***227 Lesher, 19 N.Y.3d at 67, 945 N.Y.S.2d 214, 968 N.E.2d 451 ). Rather, the agency may fulfill its burden to articulate a factual basis for the exemption under FOIL by "identify[ing] the generic kinds of documents for which the exemption is claimed, and the generic risks posed by disclosure of [those] categories of documents" ( id. ). In Lesher, for example, the prosecutor's general explanation that the correspondence sought contained information concerning the particulars of the crime and the identities and statements of witnesses and that "its release posed an obvious risk of prematurely tipping the District Attorney's hand" was sufficient to support reliance on the exemption ( id. at 67-68, 945 N.Y.S.2d 214, 968 N.E.2d 451 ).
We recognized the need to protect investigative information in Lesher even though the existence of the criminal action was a matter of public record. Before criminal proceedings have commenced, the inherent dangers of premature disclosure are even greater. In fact, the need for government confidentiality may be at its zenith when a law enforcement agency is undertaking a covert investigation of individuals or organizations, where the lives of the public, cooperators and undercover officers may hang precariously in the balance and the reputation, livelihood or liberty of the subject may be at stake. This Court has never held that FOIL compels a law enforcement agency to reveal records relating to an ongoing criminal investigation of *805 **466 a particular individual or organization to the target, the press or anyone else-and the structure and purpose of the law enforcement and public safety exemptions in Public Officers Law § 87 are rendered meaningless by a contrary conclusion. The dissent does not argue otherwise and petitioners in this case no longer challenge the applicability of the cited exemptions to the content of the investigation and surveillance records they requested.[3] ***228 Rather, the thrust of petitioners' argument is that, when declining to disclose records which fall squarely within an exemption, the NYPD must specify whether or not it possesses materials responsive to the FOIL request even when doing so would reveal information safeguarded by that same FOIL exemption. Taken to its logical extreme, petitioners argue a Catch-22 paradigm where the NYPD would have to acknowledge the existence of an investigation involving a particular person notwithstanding that the contents of any responsive records would be exempt and revelation of their existence would result in the same harm justifying exemption of the contents-whether the FOIL request comes from the target, a newspaper or some other member of the public.
The NYPD counters that this Court should follow the commonsense doctrine employed by the federal courts, which have recognized that it is permissible under the federal statutory scheme of FOIA for a federal agency to decline to acknowledge possession of responsive records when the fact that responsive records exist would itself reveal information protected under a FOIA exemption. Federal recognition of this policy dates back to Phillippi v. Central Intelligence Agency, 546 F.2d 1009 [D.C. Cir.1976] ), in which a reporter sought records from the CIA concerning its relationship with a vessel known as the Hughes Glomar Explorer, purportedly owned by a private corporation but believed to have been used by the CIA to gather information concerning sunken Russian submarines. The District of Columbia Circuit credited the CIA's explanation that, to require it to reveal whether it possessed records relating to the vessel would be tantamount to requiring it to reveal its connection to the vessel-a fact exempt from disclosure under FOIA exemptions 1 ( 5 USC § 552 [b][1], protecting materials classified pursuant to Executive Order) and 3 ( 5 USC § 552 [b][3], protecting materials "specifically exempted from disclosure by statute"). Thus, in federal parlance, when an agency neither confirms nor denies that it possesses records in response to a FOIA request, it is known as a Glomar response (see e.g.
**467 *806 Wilner v. Natl. Sec. Agency, 592 F.3d 60, 64 [2d Cir.2009], cert denied 562 U.S. 828, 131 S.Ct. 387, 178 L.Ed.2d 24 [2010] ).
***229 The federal courts have recognized that " '[FOIA's] exemptions cover not only the content of the protected government records but also the fact of their existence or nonexistence, if that fact itself properly falls within the exemption' " ( id., at 68, quoting Larson v. Dept. of State, 565 F.3d 857, 861 [D.C. Cir.2009] ). Thus, as the Second Circuit has explained, "[t]he Glomar doctrine is well settled as a proper response to a FOIA request because it is the only way in which an agency may assert that a particular FOIA statutory exemption covers the 'existence or nonexistence of the requested records' in a case in which a plaintiff seeks such records" ( Wilner, 592 F.3d at 68 ). The burden is on the agency to submit an affidavit explaining in as much detail as possible why the information protected by a Glomar response-i.e., whether the agency possesses responsive documents-logically falls within the claimed FOIA exemptions ( Phillippi, 546 F.2d at 1013 ).
Although pointed FOIA requests analogous to the inquiries here are rare, the dangers of disclosure of the existence of an investigation of a particular person have been acknowledged under that statute. In Vazquez v. U.S. Dept. of Justice, 887 F.Supp.2d 114 [D.C. Cir.2012], mot. for summary affirmance granted 2013 WL 6818207 [D.C. Cir.2013] ), plaintiff sought records about him maintained by the FBI's National Crime Information Center (NCIC), a compilation of 19 separate databases containing investigative material compiled for law enforcement purposes. In upholding the use of a Glomar response under FOIA law enforcement exemption 7(E), the court credited the FBI's assertion
"that public confirmation of NCIC transactions would alert individuals that they are the subject of an investigation as well as reveal[ ] the identity of the investigative agency. With this information, individuals could modify their criminal behavior, thereby preventing detection by law enforcement agencies and risking circumvention of the law.... In other words, persons knowing that they are being investigated by a law enforcement entity, which the requested information would reveal, could reasonably be expected to use the information to circumvent the law. Conversely, ... knowledge that there have been no NCIC checks run [would indicate the person] is not on law enforcement's ***230 radar [permitting them] to continue to engage in unlawful endeavors with renewed vigor" ( 887 F.Supp.2d at 117-118 [internal quotation marks omitted] ).
FOIA cases involving counterintelligence records are also particularly instructive. In Hunt v. Central Intelligence Agency, 981 F.2d 1116 [9th Cir.1992] ), a defendant on trial for murder sought disclosure from the CIA of records regarding his victim, an Iranian national. The Ninth Circuit upheld the CIA's use of a Glomar response, crediting its explanation in supporting affidavits that
"the disclosure of the existence or non-existence of documents must not be viewed in isolation but rather as one tile in a mosaic of intelligence gathering. Through the CIA's disclosure of the existence or non-existence of records on particular individuals, a FOIA requester could make the information public or otherwise available to counter-intelligence operations from other nations.... [T]hose experts could then determine the contours and gaps of CIA intelligence operations and make informed judgments as to the identities of probable sources and targets [who] ... could *807 **468 find themselves under suspicion and in grave danger.... [P]otential future sources would be reluctant to come forward; targets of intelligence scrutiny would be alerted and could take additional precautions; and foreign operatives could learn whether or not the CIA was aware of their activities" (981 F.2d at 1119 ).
The same risk has been recognized when the subject of the request is not an individual but a specific organization or institution. For example, in Gardels v. Central Intelligence Agency, 689 F.2d 1100 [D.C. Cir.1982] ), the FOIA request sought records from the CIA relating to its past and present relationships with the University of California. The District of Columbia Circuit emphasized that the specific request could not be viewed in isolation, particularly there where the CIA had received 125 similar requests seeking information relating to about 100 American colleges and universities. Acknowledgment of the existence of records concerning any one institution, when aggregated, could reveal substantial information relating to the CIA's covert activities and assist foreign intelligence ***231 bodies in determining which institutions to avoid and where to concentrate their efforts. In Gardels, the court reasoned that the CIA could properly treat all such requests uniformly by providing a Glomar response, neither revealing the existence or nonexistence of responsive records with respect to any one institution.
Given that our statute was modeled after FOIA, we have repeatedly looked to federal precedent when interpreting FOIL, particularly in relation to the law enforcement exemptions (see Matter of Friedman v. Rice, 30 N.Y.3d 461, 68 N.Y.S.3d 1, 90 N.E.3d 800 [2017] ; Madeiros, 30 N.Y.3d 67, 64 N.Y.S.3d 635, 86 N.E.3d 527 ; Lesher, 19 N.Y.3d 57, 945 N.Y.S.2d 214, 968 N.E.2d 451 ). And while it is not necessary for us to consider on this appeal whether there are other circumstances when a Glomar-type response might be permissible under FOIL, the analysis in the federal cases is instructive in the unique situation presented here where a targeted request seeks records concerning a specific individual's involvement in a pending NYPD investigation. As these cases demonstrate, there are indeed occasions when, due in large part to the precise manner in which the FOIL request is structured, an interpretation of the statute that compels a law enforcement agency to reveal that responsive records exist with respect to a specific individual or organization would, in effect, force the agency to disclose substantive information that is protected under FOIL's law enforcement and public safety exemptions. Just as requiring the CIA to state whether it possesses documents relating to the Hughes Glomar Explorer would reveal whether or not it was connected to that vessel, compelling the NYPD to state whether or not it possesses "investigative or surveillance" records would reveal substantive information concerning an individual's involvement with the NYPD investigation. Put another way, when there is a FOIL request as to whether a specific individual or organization is being investigated or surveilled, the agency-in order to avoid "tipping its hand"-must be permitted to provide a Glomar-type response.[4]
***232 **469 We reject petitioners' argument that there is a textual basis in New *808 York's FOIL statute foreclosing an agency from declining to reveal whether responsive documents exist when it is denying a FOIL request based on a statutory exemption. The general rule requiring an agency to acknowledge the existence of responsive records stems from the presumption of access-it is usually necessary for an agency to reveal that a particular record exists in order to demonstrate the applicability of an exemption.[5] But there is no specific statutory language requiring an agency to certify the existence of records wholly protected under an exemption. Petitioners rely on Public Officers Law § 89(3)(a), which states that an agency "shall certify that it does not have possession of such record or that such record cannot be found after diligent search." However, that provision is triggered when, in lieu of granting a FOIL request, the agency finds that it either does not possess the item requested or is unable to locate it after a diligent search (see Matter of Rattley v. New York City Police Dept., 96 N.Y.2d 873, 874-875, 730 N.Y.S.2d 768, 756 N.E.2d 56 [2001] ); it does not require certification of the existence of records for which the agency is claiming an exemption. Here, the NYPD based its denial on the applicability of various exemptions and not on an inability to locate responsive documents after ***233 a diligent search. Nor is the response inconsistent with the provisions in section 89(3)(a) identifying the three permissible final responses to a FOIL request: (1) grant the request and disclose documents, (2) certify that the record cannot be found after a diligent search, or (3) "deny such request," invoking one or more exemptions (see Matter of Beechwood Restorative Care Ctr. v. Signor, 5 N.Y.3d 435, 440-441, 808 N.Y.S.2d 568, 842 N.E.2d 466 [2005] ). The determinations under review, in which the NYPD refused to turn over any records relying on multiple exemptions, fell into the third category-a denial of the request for records.[6] *809 **470 It is the rare case where, due to the surrounding circumstances and the manner in which a FOIL request is structured, acknowledging that any responsive records exist would, itself, reveal information tethered to a narrow exemption under FOIL. But when a FOIL request seeks to ascertain if a specific person or organization is under investigation by the NYPD Intelligence Bureau, such a response is entirely consistent with the purpose and structure of our statute. To recognize that those unusual circumstances coalesce here does not create a broad judicial exemption as the dissent erroneously claims. Rather, we are applying a commonsense interpretation of the relevant statutory language to give full effect to the law enforcement and public safety exemptions carefully crafted by the legislature, as interpreted for decades by this Court. A model of understatement, the dissent recognizes that requiring an agency to acknowledge the existence of records in these circumstances "may have concerning implications" (dissenting op. at 270-271, 76 N.Y.S.3d at 496-97, 100 N.E.3d at 835-36) but protests that the Court is powerless to avoid such a result-that only the Legislature can intervene. We disagree. The legislature has already acted by adopting the law enforcement and public safety exemptions-the task of ***234 interpreting them falls squarely within the province of the courts. At bottom, the legislative intent was not to provide public access to information, the secrecy of which is necessary to sustain the government's legitimate exercise of police powers to investigate criminal activity. We will not abdicate our fundamental role to interpret the statutory language to give full effect to the FOIL exemptions implicated in this case, just as the federal courts have done in the Glomar cases. While the dissent rightfully expresses concern about "blanket" or "carte blanche" exemptions, we endorse nothing of the sort here as our decision is premised on respondents' factual demonstration of the necessity for non-access, which is addressed below. Like the federal courts, our courts must scrutinize an agency's refusal to confirm or deny the existence of responsive documents on a case-by-case basis to ensure it is warranted under the particular circumstances presented.
Here, in assessing the propriety of the agency's refusal to reveal whether responsive records exist, we begin with the requests themselves, which were both extremely specific and quite unusual. Indeed, we know of no other FOIL case in which individuals who had never been arrested, involved in a police confrontation or formally charged have asked a police agency to acknowledge if they were under investigation. Abdur-Rashid requested records relating to any "investigation" or "surveillance" of himself, individually or in his capacity as leader of a religious institution. Hashmi similarly sought all records relating to "investigation" or "surveillance"
*810 **471 of himself or a student group with which he is associated. In their petitions, both men referred to news articles describing the NYPD's ongoing counterterrorism investigation and surveillance program.[7] Petitioners seek to learn their connection, if any, to this endeavor-anyone ***235 who suspects, reasonably or otherwise, that they are the subject of or even a peripheral figure in a covert police investigation might understandably feel the same. However, FOIL was never designed to compel a law enforcement agency to disclose inherently confidential, investigatory information of this nature.
Petitioners' requests for information concerning a recent or ongoing investigation by a law enforcement agency implicate the core concerns underlying the law enforcement and public safety exemptions. Under Lesher, the agency could meet its obligation to provide a factual basis for the exemptions by identifying the generic kind of records for which the exemption was claimed and the generic risks posed by disclosure of those types of records. The Galati affidavits fulfilled that requirement. Without revealing any specific information about these petitioners (which it could not do without revealing the very information it claimed was exempt), the affidavit explained in extensive detail how disclosing the information sought-i.e., who has been the subject of investigation or surveillance-would imperil its ongoing counterterrorism efforts to protect New York City.
Chief Galati noted that, unlike other NYPD units that investigate crimes after they have occurred (essentially gathering evidence to reconstruct a past event), the intelligence unit of the NYPD is tasked with the objective to be preemptive-amassing information to deter, detect and thwart future terrorist activity. He described numerous, recent cases involving terrorist activity in New York City, demonstrating that the City remains a primary target for terrorist attacks and that, working jointly and sharing information with other state and federal law enforcement agencies, his unit plays a pivotal role in identifying terrorist plots and arresting those involved in order to prevent planned attacks designed to cause mass casualties. The unit gathers information from a myriad of sources, from undercover operations and confidential informants to open sources, as well as a well-publicized counterterrorism hotline, welcoming any and all leads from the public on a promise of confidentiality. Chief Galati averred that it was essential to the ***236 operational integrity of the intelligence program that it be *811 able **472 to keep confidential the information it gathers, the sources it uses and the methodologies and tactics it employs to defend against countermeasures used by individuals and organizations to expose the vulnerabilities in the NYPD program. The NYPD's role in preventing the next attack is dependent on its ability to collect information without publicizing its methods or sources to anyone who can use the information to counter its efforts, an assertion consistent with the basic realities of intelligence work.
Further, Chief Galati asserted that the FOIL requests under review here could not be viewed in isolation, noting that the NYPD was beginning to receive similar requests from others. In particular, Chief Galati highlighted the recent initiation of a mass FOIL campaign by a local organization, which encouraged and assisted constituents in submitting requests to the NYPD "FOILing" themselves. The affidavit explained that, if records from disparate requests were aggregated, this would place any individual response into a larger mosaic which could be used to analyze NYPD's counterterrorism operation and identify areas of focus and sources of information. Critically, Chief Galati contended that compelling the NYPD to acknowledge that it possesses records responsive to the request-even if it did not turn over documents-would reveal whether petitioners or the organizations with which they are affiliated were subjects of NYPD investigative interest, information that is itself exempt from disclosure.
The Appellate Division did not err in determining that the Galati affidavit established a factual basis for the exemptions claimed under the circumstances presented. This is true even though the NYPD does not claim (nor could it, consistent with its desire to maintain secrecy) that petitioners or their organizations are connected in any way with its pending counterterrorism investigation. As the federal courts have recognized (see generally Gardels, 689 F.2d 1100 ), a Glomar-type response would be ineffective if it were permissible only when the agency possesses responsive records, even though that is the situation when it is most evident that revealing the existence of the records would damage a pending investigation. Such a myopic approach would prove unworkable because it would not be difficult to distinguish between individuals and organizations who are under investigation (who would receive a Glomar-type response) and those who are not (who would be ***237 told that responsive records do not exist). Thus, in the circumstances presented here, when confronted with a targeted FOIL request of this nature, a police agency must be permitted to give a uniform response-to decline to confirm or deny the existence of responsive material in either scenario-on the rationale that whether or not it is investigating a particular person or organization constitutes information that is itself statutorily exempt from disclosure.
Finally, petitioners argue that even if-as we have concluded-an agency can decline to acknowledge that responsive records exist in these unique circumstances, various safeguards recognized by the federal courts preclude the NYPD's use of such a response here. For example, petitioners contend that an agency cannot decline to reveal the existence of records when it has publicly revealed the information for which it is claiming an exemption. They further argue that the NYPD invoked Glomar in a bad faith effort to cover up embarrassing or unlawful acts, such as its use of racial or religious profiling. We caution that we have no occasion in this case to consider whether a Glomar-type response is available under FOIL in any circumstance other than that presented *812 here where the request involves an ongoing **473 criminal investigation, nor do we adopt wholesale the approach taken by the federal courts. That being said, we agree that a police agency that has already revealed the records sought and for which it claims an exemption cannot credibly support such a response. Here, petitioners have not come forward with any evidence that the NYPD publicly acknowledged that it investigated or surveilled petitioners or the organizations referenced in their specific FOIL requests.
As for bad faith, the strongest safeguard against misuse of a FOIL exemption is the factual showing requirement. An agency denying a FOIL request must establish a bona fide, factual basis for the exemptions claimed and any evidence that undermines that showing is material to the court's assessment of the adequacy of the agency's submission-including a claim of bad faith. Although there is no language in the statute authorizing the procedure, New York courts have interpreted FOIL to permit in camera review of sensitive or confidential materials when the court deems such a procedure appropriate or necessary in a particular case to test the legitimacy of a claim of confidentiality or to oversee the redaction process in cases where portions of a record are subject to disclosure (see e.g.
***238 Matter of New York Times Co. v. City of N.Y. Fire Dept., 4 N.Y.3d 477, 490, 796 N.Y.S.2d 302, 829 N.E.2d 266 [2005] ).[8] Given that the requests here sought "investigative" and "surveillance" records involving a specific person relating to a discrete time period immediately preceding the request, and in light of the comprehensive affidavit supporting application of the claimed exemptions, there was certainly no abuse of discretion in declining to order in camera review in these cases.
Moreover, other than general allegations arising from news reports, petitioners offered no evidence that the NYPD's response to these particular requests is a function of bad faith, rather than the legitimate law enforcement concerns identified in the comprehensive Galati affidavit. Notably, the Galati affidavit set forth the types of investigative activities which the NYPD is authorized to conduct in furtherance of its goals of detecting or preventing terrorist activities, none of which hinted at an insidious type of surveillance (see e.g. People v. Capolongo, 85 N.Y.2d 151, 160, 623 N.Y.S.2d 778, 647 N.E.2d 1286 [1995] ). Here, the Galati affidavit was properly deemed sufficient to meet the factual basis requirement for the invocation of the statutory exemption. However, there may well be instances when the FOIL request is more general, either in terms of its subject or the nature of the materials sought, where the propriety of a Glomar-type response is less clear from the law enforcement agency affidavit, or where indicia of improper motive significantly undermine the asserted basis for the exemption. In that event, some form of in camera review may be warranted, even if modifications to the typical procedure are necessary. Thus, our existing FOIL paradigm contains important safeguards against misuse of the exemptions *813 that are no less available in the rare instance when a law enforcement agency **474 denying a request neither confirms nor denies the existence of responsive records.
It bears emphasizing, as is also true under FOIA, that if an agency establishes that the records sought fall within a FOIL exemption adopted by the legislature, the courts cannot order disclosure based on some other public policy concern asserted by a party or the court (see Hanig, 79 N.Y.2d at 112, 580 N.Y.S.2d 715, 588 N.E.2d 750 ; see ***239 Minier v. Central Intelligence Agency, 88 F.3d 796, 802-803 [9th Cir.1996] ). While FOIL is an important tool in ensuring government transparency and public accountability, it is not-and was never designed to be-the only check against government overreach. For example, post-use notice requirements are set by the legislature for intrusive police surveillance, taking into account the need to protect the secrecy of the pending investigation (see CPL 700.50[3] ). Complaints of unconstitutional discriminatory actions have resulted in federal court actions and settlements (see Handschu v. Special Services Div., 605 F.Supp. 1384, 1416 [S.D. N.Y.1985] ). Further, petitioners' claims that an NYPD investigative unit engaged in improper racial and religious profiling were the subject of numerous press articles. As averred in the Galati affidavit, the NYPD-while denying any wrongdoing-has nonetheless changed its policy.
For all of these reasons, under the circumstances presented here, where necessary to give full effect to the law enforcement and public safety statutory exemptions, the NYPD's response neither confirming nor denying the existence of the investigative or surveillance records sought is compatible with FOIL and the policy underlying those exemptions, which is to provide the public access to records without compromising a core function of government-the investigation, prevention and prosecution of crime.
Accordingly, in each case, the order of the Appellate Division should be affirmed, with costs.

While petitioners waived their own privacy interests, they did not claim to have the authority to waive the privacy interests of other members of the associated entities with respect to which they also sought information.

In New York, challenges to FOIL determinations are resolved in summary proceedings pursuant to CPLR article 78 (see Public Officer's Law § 89[4][b] ). Where-as here-exemptions are relied upon, "the agency involved shall have the burden of proving that such record falls within" the claimed exemptions (id. ). Beyond merely disposing of motions to dismiss, here the Appellate Division considered the petitions on the merits, concluding the NYPD met its burden of justifying its reliance on FOIL exemptions in each instance to shield the existence and contents of any responsive records. Whether the court erred in that regard presents an issue of law in this Court. We therefore disagree with the suggestion that the merits are not ripe for adjudication by virtue of a "scant record" or "contested facts" (Wilson, J., concurring and dissenting op. at 257, 76 N.Y.S.3d at 486-87, 100 N.E.3d at 825-26). In each proceeding, the record here was fully developed; the NYPD supplied all of the documents comprising a return, supported by a detailed affidavit explaining the basis for the claimed exemptions, which submissions were addressed by petitioners.

Nowhere in their briefs do petitioners analyze the propriety of the exemptions as applied to their requests. Petitioners cite with approval the Appellate Division decision in Matter of Asian Am. Legal Defense & Educ. Fund v. New York City Police Dept., 125 A.D.3d 531, 5 N.Y.S.3d 13 (1st Dept. 2015), lv denied 26 N.Y.3d 919, 2016 WL 699225 [2016] ("AALDEF" ) ) in which an organization sought thirteen categories of documents generated by the NYPD Intelligence Division relating to investigation of Muslim persons, among others. There the Appellate Division indicated that these documents fell within the law enforcement exemption. Petitioners do not dispute that the "investigation" and "surveillance" records they seek here, if they exist, would be a subset of the documents they acknowledge were properly treated as exempt in AALDEF . While, as the dissent notes, petitioners have not been provided with the records requested, they could have argued that records of a recent or pending covert investigation of specific individuals are not exempt from disclosure-but it is telling that neither they nor the dissent make such a claim. Instead, the dissent essentially ignores the fact that petitioners specifically requested "investigation" and "surveillance" records-not some other class of documents without a clear connection to such activities.

Although we find federal law persuasive, we reach this conclusion by interpreting FOIL's statutory exemptions and our cases construing them-there has been no "blind adoption of a federal judicial doctrine" (see dissenting opn. at 267, 76 N.Y.S.3d at 494, 100 N.E.3d at 833). That being said, we are unpersuaded that there are relevant textual distinctions between the provisions of FOIA and FOIL. The fact that FOIL requires that a request be "denied" whereas FOIA permits an agency to treat FOIA as "not apply[ing]" to exempt matters in no way impacts the Glomar issue, nor has any federal court relied on the dissent's novel textual analysis. The 1986 amendment adding 5 USC § 552(c) -discussed extensively by the dissent-likewise in no way undermined the commonsense analysis underlying the federal Glomar cases that precede or follow it, which do not restrict the doctrine to classified or national security materials under exemptions 1 and 3. The dissent's speculation that the analysis is unavailable or limited in cases involving FOIA's law enforcement exemptions is unsupported and inconsistent with cases indicating just the opposite (see Vazquez, 887 F.Supp.2d 114 ; see e.g. United States Dept. of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 [1989] [upholding denial of request under law enforcement exemption 7(c) where agency neither confirmed nor denied possession of information on rap sheet involving specific individual] ). Moreover, the dissent's analysis misses the mark for the more fundamental reason that it fails to focus on the facts of this case and the contours of New York's law enforcement and public safety exemptions-which are controlling here.

In most instances, the fact that an agency possesses responsive records does not itself provide substantive information protected by an exemption. For example, in Lesher, the pending prosecution was a matter of public record and, as such, the fact that the District Attorney possessed responsive records did not reveal confidential information-only the contents of those records fell within an exemption. Thus, in cases like Lesher involving pending or completed prosecutions, a request for records related to a defendant in the possession of the pertinent police agency would be unlikely to engender a Glomar-type response because the fact that defendant has been the subject of investigation is obvious from the prosecution itself. In that scenario, the contents of the records may or may not be exempt under FOIL, but the fact that responsive records exist would not be.

The dissent's conclusion to the contrary is puzzling. FOIL provides a mechanism for public access to records and, here, the NYPD expressly and categorically denied petitioners' FOIL requests. In this case, if responsive records do not exist, petitioners were not entitled to disclosure of anything. If responsive records do exist, the question is whether either their contents-or the fact that they exist, which itself may disclose confidential information-is protected under one or more FOIL exemptions. We believe this is the central issue in the case, which the dissent entirely fails to confront. If the existence of records is protected information under a statutory exemption, nothing in FOIL compels its disclosure. In this regard, it is the dissent that adopts a new requirement found nowhere in the text of the statute-a requirement that, in all instances, an agency expressly certify that responsive records exist, regardless of whether the existence of the records is protected under an exemption.

The dissent faults the Galati affidavit for justifying the NYPD's response by referencing its counterterrorism investigation, lamenting that "we do not know if any past or current investigations of petitioners actually related to counterterrorism" (dissenting op. at 265, 76 N.Y.S.3d at 492-93, 100 N.E.3d at 832). However, the NYPD response cannot be so easily dismissed. In the petitions, petitioners referenced news articles alleging that the NYPD was engaged in an ongoing domestic surveillance program involving Muslim individuals and institutions. The news articles reported that, in the wake of the September 11th attacks, the NYPD, with the assistance of the CIA, had undertaken a covert domestic counterterrorism operation in the tri-state area. The NYPD thus interpreted petitioners' request for "investigation" and "surveillance" records (for a discrete time period immediately preceding the request) as relating to that ongoing investigation, described in detail in the Galati affidavit; this was not the product of an "unsupported assumption" (see dissenting op. at 265, 76 N.Y.S.3d at 492, 100 N.E.3d at 831). The NYPD could not have provided more specific information relating to these individuals without disclosing precisely the information claimed to be exempt-i.e., whether petitioners were subjects of the investigation they referenced-which is exactly the purpose of the refusal to confirm or deny the existence of the information sought.

Despite its concern about judicial overreach, the dissent endorses the in camera review procedure, taking no issue with this exercise of judicial prerogative. While noting the absence of in camera review (see dissenting op. at 266, 270, 76 N.Y.S.3d at 492-93, 495-96, 100 N.E.3d at 831-32, 834-35), the dissent neither suggests that the nisi prius court abused its discretion by failing to invoke the procedure nor explains what types of materials could have been submitted that would have warranted a different outcome here where no one disputes that the requested "investigation" or "surveillance" records, if they exist, are exempt from disclosure.